# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

**NEIL CASTELLON,** individually and
on behalf of all others similarly situated,

        **Plaintiff,**

**v.**

**BANK OF AMERICA, N.A.,**

        **Defendant.**

**CASE NO.:**

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT AND DEMAND FOR A JURY TRIAL

# TABLE OF CONTENTS

NATURE OF THE CASE .................................................................................2

PARTIES .......................................................................................................7

JURISDICTION & VENUE ............................................................................8

FACTUAL ALLEGATIONS .........................................................................10

    I.    BoA's Surveillance Apparatus...........................................................10

        A.    BoA Weaponized Its Customer Data to Surveil People Rather Than Detect Crime ...................................................10

        B.    The Data BoA Collects: This Not Your Grandpa's Bank .........11

    II.    How BoA Builds Its Surveillance Database........................................22

        A.    AI-Powered Data Mining Infrastructure...................................22

        B.    How BoA Uses Its Trove of Data and With Whom It Shares This Data .........................................................................23

    III.    BoA Deploys Its Breathtaking Surveillance Capabilities in January 2021 to Engage in a Massive, Systematic, and Coordinated Surveillance Operation on Its Own Customers...................................25

        A.    The Initial Voluntary Search and Disclosure (January 7-8, 2021) ......................................................................25

            1.    BoA's Targeted Search and Surveillance........................25

            2.    BoA's Unlawful Disclosure ............................................27

        B.    The Formalized FBI-Bank Coordination (January 15, 2021)...29

        C.    The Broader FinCEN Coordination..........................................30

        D.    BoA's Illicit Conduct Constituted Illicit Surveillance, Not Simple Transaction Monitoring .................................................34

1.    What the Bank Secrecy Act Was Designed to Detect ....34

2.    What BoA Actually Did..................................................40

3.    The Right to Financial Privacy Act of 1978...................42

4.    Privacy Rights and Injury-in-Fact ..................................47

E.    BoA's Unlawful Disclosure of Plaintiff's Financial Records ...54

F.    Defendant's Disclosures Were Not Made for Any Lawful Purpose...........................................................................58

G.    BoA's Conduct Exceeded the Scope of the BSA and PATRIOT Act ....................................................................59

H.    BoA's Reports Were Not Made in Good Faith.........................60

I.    BoA Acted Under the Color of Law and Violated the First, Fourth, and Fifth Amendments ..................................61

J.    BoA Converted Property Plaintiff's and Class Members' Personal and Financial Data........................................64

K.    Damages Suffered by Plaintiff and Class Members ................67

IV.    CLASS ALLEGATIONS ....................................................68

CAUSES OF ACTION ...................................................................74

PRAYER FOR RELIEF .................................................................84

JURY DEMAND ...........................................................................86

Plaintiff Neil Castellon ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Bank of America ("Defendant," "BoA" or the "Bank") for its stunning and willful violations of Plaintiff's and Class members' rights under the Right to Financial Privacy Act of 1978 ("RFPA"), 12 U.S.C. § 3401 *et seq.*, the United States Constitution, and related claims arising from Defendant's unlawful disclosure of Plaintiff's and Class members' confidential financial records and personal information.

Except as to the allegations pertaining to Plaintiff, Class members and counsel, which are based on personal knowledge, allegations made in this Complaint are made based on facts set forth in official government reports,[1] the investigation of counsel for Plaintiff and the Class, and upon information and belief.

---

[1] *See* STAFF OF H. COMM. ON THE JUDICIARY & SELECT SUBCOMM. ON THE WEAPONIZATION OF THE FED. GOV'T, 118TH CONG., FINANCIAL SURVEILLANCE IN THE UNITED STATES: HOW THE FEDERAL GOVERNMENT WEAPONIZED THE BANK SECRECY ACT TO SPY ON AMERICANS (Comm. Print 2024), https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/2024-12/2024-12-05-Financial-Surveillance-in-the-United-States.pdf (last visited December 4, 2025) (the "December Staff Report"); *see also* STAFF OF H. COMM. ON THE JUDICIARY & SELECT SUBCOMM. ON THE WEAPONIZATION OF THE FED. GOV'T, 118TH CONG., INTERIM STAFF REP. ON FINANCIAL SURVEILLANCE IN THE UNITED STATES: HOW FEDERAL LAW ENFORCEMENT COMMANDEERED FINANCIAL INSTITUTIONS TO SPY ON AMERICANS (Comm. Print 2024) (the "March Staff Report"), https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/How-Federal-Law-Enforcement-Commandeered-Financial-Institutions-to-Spy.pdf (last visited December 4, 2025). True and correct copies of the Interim Staff Reports are attached, respectively, as Exhibits 1 and 2 of this Complaint, and the contents of which are incorporated in this Complaint as if set forth here in full.

## NATURE OF THE CASE

1.      This action challenges an unprecedented warrantless surveillance program in which Bank of America abandoned its role as a neutral custodian of customer funds and instead became a sophisticated aggregator of personal and financial customer data that it used to conduct suspicion-less searches of customers, targeting them for their location, purchases, political beliefs and associations, the results of which were then shared with an estimated 472 federal, state and local law enforcement agencies.

2.      According to whistleblower testimony before the House Judiciary Committee and documents reviewed by the Select Subcommittee on the Weaponization of the Federal Government, BoA in fact voluntarily—and without a warrant, notice, consent or process—data-mined its entire customer base to identify anyone who happened to use a Bank of America product in the Washington, D.C. metropolitan area during a three-day window.

3.      Then, in a chilling demonstration of its surveillance capabilities, the Bank cross-referenced this geographic data against its historical records to elevate to the top of its list anyone who had ever purchased a firearm or made a firearm-related purchase using any Bank of America product—regardless of when or where that purchase occurred. BoA later sought to identify any other customers who had a

return trip planned to the D.C. Metro area or who made lawful purchases with no nexus to criminal activity.

4.      With animus and reckless disregard of its customers' rights, BoA conducted searches of Plaintiff's and Class members' financial transaction records based on where Americas were located at the time of a transaction, used merchant codes of lawful purchases to determine what consumers were purchasing, including religious texts, and used search terms or transactions that might suggest association with a political party.

5.      In a stunning violation of the RFPA and the most basic of rights afforded to Plaintiff and Class members by the U.S. Constitution, BoA then provided the results of these searches and customer financial records to law enforcement authorities.

6.      BoA's disclosures were made without customer notice or consent and without complying with the mandatory procedural requirements of the RFPA.

7.      BoA's disclosures were also made without any lawful purpose recognized by the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311 *et seq.*, the USA PATRIOT Act, Pub. L. No. 107-56, or any other statutory or regulatory authority that might otherwise authorize such disclosures. Instead, BoA's disclosures extended far beyond any permissible reporting requirements and constituted unauthorized and

unlawful dissemination of protected customer information to federal, state and local government law enforcement agencies.[2]

8.     BoA's searches and subsequent disclosures are not what the Bank Secrecy Act authorizes, nor is it what Americans expect or agree to when they open a bank account. Whatever side of the political spectrum one may sit, this is not what any free society should tolerate.

9.     BoA also engaged in unlawful cooperation and joint activity with law enforcement agencies and the Financial Crimes Enforcement Network ("FinCEN"), through which BoA provided Plaintiff's and Class members' confidential, protected financial information to government officials without a warrant, subpoena, or other lawful process, and did so due to an irrational prejudice and out of the desire to harm a politically unpopular group without a legitimate governmental interest.

10.    By voluntarily and proactively searching for and sharing financial records, internal transaction data, and surveillance notes outside the scope contemplated by the BSA, USA PATRIOT Act, and implementing regulations,

---

[2] To the extent BoA claims its disclosures and unlawful search and seizure are somehow bubble-wrapped in the form of a Suspicious Activity Report (SAR), Defendant is misplaced. Any SAR at issue in this Complaint was filed as a pretext to evade the RFPA and was not filed in good faith as required by the safe harbor provisions of the BSA and related statutes. The conduct at issue was also not reasonably related to any statute or regulation that might permit disclosure in other circumstances. Instead, BoA disclosed customer financial information regarding lawful conduct, in retaliation against customers for their political beliefs, to aid in unlawful, warrantless domestic surveillance or for other improper purposes wholly unrelated to legitimate anti-money laundering or counter-terrorism objectives. BoA's conduct is nothing short of a violation of the RFPA and the basic rights afforded to Plaintiff and the Class by the United States Constitution.

Defendant acted under the color of law, jointly participating with government actors to: (a) effect warrantless and unreasonable searches and seizures without particularity or probable cause in violation of the Fourth Amendment, (2) deprive Plaintiff and Class members of their Fifth Amendment procedural and substantive due process rights, and (3) infringe on Plaintiff and the Class members' First Amendment right of free association.

11.    Defendant's conduct exceeded any permissible statutory reporting requirements and was undertaken voluntarily, at its discretion, and/or at the request, encouragement, or direction of law enforcement officials, rendering BoA a willful participant in joint activity with the State under § 1983.

12.    BoA's conduct as documented by the House Judiciary Committee's interim staff reports of March 6, 2024, and December 6, 2024, should concern Americans across the political spectrum—not *despite* its connection to the events that occurred on January 6, 2021, but precisely *because* of how it was carried out. BoA, without legal process and without a directive from law enforcement, voluntarily data-mined private information to identify customers based on transaction type and location. BoA—a retail bank—conducted this search of its own accord. It was not a narrow search or investigation of suspected criminals or suspicious transactions; it was a sweeping dragnet of lawful activity of those who

5

were in the Washington, D.C. area—for work, or to visit or perhaps even to counter-protest.

13.    For those in attendance at the January 6, 2021 rally (the "Rally"), consider the actual numbers. While estimates of Rally attendance range from 53,000 (per the House Select Committee) to as high as 80,000 or more, approximately 10,000 people proceeded onto Capitol grounds, and the FBI estimates that 2,000 to 2,500 actually entered the Capitol building itself. Most attendees were exercising their First Amendment right to peaceful assembly and never set foot near the Capitol. Yet BoA's search captured everyone: those who were in Washington D.C. for any reason whatsoever, to attend the rally or not, who bought a coffee, stayed in a hotel, or filled their gas tank in the region that weekend, and then flagged them to law enforcement.

14.    The uncomfortable truth for those inclined to dismiss this as acceptable because of the political context: the infrastructure and precedent being established here is ideologically agnostic. A bank willing to mine its databases to identify conservatives attending a right-leaning rally today is equally capable of mining those databases to identify progressives attending a left-leaning protest tomorrow. If financial institutions can be induced—or take it upon themselves—to flag customers based on proximity to a political event, purchases of legal goods, or search terms like "MAGA" and "TRUMP" (as documented in the March 2024 report), there is no

6

principled barrier preventing the same apparatus from targeting those who use "AOC" or "BLM" in a peer-to-peer transaction description, purchase books on critical theory, or donate to environmental causes. The threat is not partisan; it is structural, and it should alarm anyone who believes that private financial data should not be weaponized to identify citizens based on their lawful political activities or purchases.

15.    Although economic injuries are not essential to an RFPA claim, Plaintiff and Class members, as a direct and proximate result of BoA's unlawful conduct, have suffered substantial harm, including but not limited to: deprivation of procedural and substantive due process rights and the right to be free from unreasonable, excessive searches and seizures; infringement on the right to free association, invasion of privacy; damage to reputation; wrongful termination of banking relationships; placement on government watch lists; adverse employment consequences; emotional distress; and other cognizable injuries.

**PARTIES**

16.    Plaintiff Neil Castellon is a citizen and resident of Orlando, Florida. At all times relevant to the Complaint, Plaintiff maintained an individual consumer bank account in his own name at BoA out of which the payments at issue in this Complaint were made. Plaintiff's financial records were unlawfully disclosed by Defendant in violation of the RFPA, and Plaintiff was subjected to unlawful searches

and seizures and deprived of procedural and substantive due process in violation of the Fourth and Fifth Amendments of the United States Constitution.

17.     As an individual or partnership of five or fewer individuals, at all times relevant to the Complaint, Plaintiff was a person within the meaning of the RFPA, 12 U.S.C § 3401(4), and a "customer" who utilized services of BoA for an account maintained in his own name.

18.     Defendant BoA is a federally chartered national bank regulated by the Office of Comptroller of Currency with its headquarters and principal place of business located in Charlotte, N.C.

19.     BoA is a "financial institution" as defined by the RFPA, 12 U.S.C. § 3401(1), and is subject to the requirements and prohibits of that statute.

20.     BoA operates banking facilities throughout the United States, including banking branches located throughout Florida and in Orlando and maintains customer accounts for millions of individuals and entities, including Plaintiff and Class members.

## JURISDICTION & VENUE

21.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law, specifically the Right to Financial Privacy Act (RFPA) of 1978, 12 U.S.C. § 3401 *et seq*., and 42 U.S.C. §

1983, a federal law that provides a private right of action for the deprivation of constitutional rights.

22.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332 (d) because: (a) This is a class action involving more than 100 class members; (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs; and (c) minimal diversity exists between Plaintiff and Defendant.

23.     The Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367 because the state and federal law claims share the same common nucleus of operative fact and are so related to federal claims within the Court's original jurisdiction that the state law claims form part of the same case and controversy under Article III of the United States Constitution.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant transacts substantial business in this District, maintains a branch in this District and because the venue selection clause mandates that Plaintiff file in this District.

25.     This Court has personal jurisdiction over BoA because BoA is registered to do business in Florida, conducts substantial business in this District, maintains offices and branches in this District, and committed tortious acts causing injury to Plaintiff, who resides in this District, and Class members.

26.    Jurisdiction and venue are also proper based on the BoA Consumer Deposit Agreement, which provides in pertinent part, "Any action or proceeding regarding your account or this Agreement must be brought in the state in which the financial center that maintains your account is located. You submit to the personal jurisdiction of that state."[3]

27.    Plaintiff resides in Orlando, Florida and his account is maintained in Florida.

## FACTUAL ALLEGATIONS

### I.    BoA's Surveillance Apparatus

#### A.    BoA Weaponized Its Customer Data to Surveil People Rather Than Detect Crime

28.    BoA operates one of the most sophisticated data surveillance systems in the American financial sector and possesses technological capabilities that would be the envy of any 21st-century intelligence agency. With 270 active artificial intelligence and machine learning models, nearly 1,500 AI patents, and billions in annual technology spend, BoA possesses the technological infrastructure to monitor, analyze, and profile virtually every customer and financial transaction made by its tens of millions of customers. This capability was used in the days following January

---

[3] Bank of America Deposit Agreement and Disclosures, effective November 14, 2025, at 36, https://www.bankofamerica.com/salesservices/deposits/resources/deposits/resources/deposit-agreements/ (last visited November 25, 2025).

10

6, 2021, and turned into a proactive operation used to surveil and unlawfully search for individuals based on their ***geographic location and constitutionally protected purchasing decisions***—not suspicious transactions.

29.    BoA engaged in voluntary data mining beyond SAR-triggering scenarios resulting in proactive searching and unlawful surveillance rather than transaction-based anomaly detection. In doing so, BoA violated the RFPA, unlawfully converted their property and infringed on Plaintiff's and Class members' constitutional rights.

**B.    The Data BoA Collects: This Not Your Grandpa's Bank**

30.    To understand the scope of BoA's surveillance capabilities, one must understand the breadth of data BoA collects and retains on its customer-base.

31.    To begin, BoA's data capabilities stretch across ***69 million consumer and small business clients***, encompass detailed data on approximately ***49 billion annual transactions*** and payments, and ***include 1.8 trillion client data points***.[4]

32.    According to Hari Gopalkrishnan, BoA's Chief Technology & Information Officer, BoA has "invested $1.5 billion in the last 5 years to organize,

---

[4] BoA November 2025 Investor Presentation deck, at 272.

collect information and data, transactional data, customer behavioral data, demographic data across multiple lines of business."[5]

33.    BoA is "now approaching almost 1 exabyte of storage" of customer data.[6] To put that in perspective, Mr. Gopalkrishnan explained that he "get[s] stressed when [he] get[s] a document that's in the multiple megabytes and exabyte is 1 trillion megabytes."[7]

34.    The database operates across BoA's entire enterprise, and BoA collects and stores data on every customer that reflects intimate details of a person's life, from detailed identity and biographical information, to current and historic numbers and addresses, detailed location data, account and relationship data, employment data, biometric data, copies of signatures and government-issued identification documents, comprehensive digital telemetry from online and mobile banking sessions, behavioral data, and detailed transaction data that, in some instances, contain receipt-level detail.

---

[5] Presentation of Hari Gopalkrishnan, *BoA November 2025 Investor Presentation* (November 2025). A transcript of the presentation is accessible at https://seekingalpha.com/article/4840732-bank-of-america-corporation-bac-analyst-investor-day-transcript (last visited December 8, 2025).

[6] *Id.*

[7] *Id.*

35.     BoA also collects and retains information about a customer's racial and ethnic origin, citizenship or immigration status, religious or philosophical beliefs and union membership.[8]

36.     BoA also collects and discloses the contents of "mail, email and text messages, unless the business is the intended recipient of the communication", in addition to information regarding a customer's health.[9]

37.     In the category of identity and biographical information, BoA maintains records of each customer's full legal name, aliases, and "doing business as" names. At a very minimum, the Bank stores Social Security Numbers, Employer Identification Numbers, and foreign taxpayer identification numbers. It retains dates of birth, gender designations, and comprehensive address histories—not merely current addresses, but every address a customer has ever provided.

38.     The Bank also maintains all phone numbers associated with a customer, whether home, work, mobile, or fax, along with email addresses and website URLs.

---

[8]     BoA     California     Consumer     Privacy     Act     (CCPA)     Disclosure, https://web.bankofamerica.com/en/privacy/ccpa-disclosure (last visited December 9, 2025). BoA does not include this granular list in its general privacy policy; however, upon information and belief, BoA collects, retains and discloses the same information for its customers that it does for California residents. Notably, BoA does **not** disclose in its general privacy policy that it may voluntarily share customer information with the government or other banks. Regardless of whether BoA may provide this information in limited circumstances without legal process, and regardless of whether a customer may or may not be entitled notice and the opportunity to object, BoA's privacy policy is false, deceptive and misleading in that it fails to provide customers with notice of the ways in which it shares information.

[9] *Id.*

13

Perhaps most significantly for identification purposes, BoA stores driver's license numbers, passport numbers, and other government identification credentials, often including images of the documents themselves.

39.    The Bank also collects and retains information about a customer's occupation, employment, employment history, employer information, and North American Industry Classification System codes that categorize each customer's profession or business.

40.    Regarding account and relationship information, BoA maintains a complete record of every account number across all of its product lines—checking accounts, savings accounts, credit cards, mortgages, home equity lines, auto loans, insurance policy numbers, and investment accounts. BoA tracks account opening dates and the total duration of each customer relationship. It monitors account balances and credit limits in real time. Each customer is assigned relationship designations indicating whether they are a standard customer, a borrower, an employee, an officer, or an owner of a business account. Joint account holders, authorized users, and signatories are all documented and linked within the Bank's systems.

41.    BoA also collects and retains internet and other electronic network activity information, such as browsing history, search history, geolocation data and

IP location, and information regarding a customer's interaction with its internet website application or BoA advertisements.

42.     The most granular category of data is the complete transaction history. BoA records every debit card swipe, every credit card purchase, and every ATM withdrawal. Every check written and every check deposited is logged. Every wire transfer and ACH payment captured, and peer-to-peer payments, such as Zelle transactions, are also captured together with any message sent from the customer to the recipient as part of the payment. Every bill payment and automatic transfer is documented.

43.     For each of these transactions, the Bank records the date, time, amount and location where it occurred. The Bank captures the name of every merchant and assigns a Merchant Category Code that classifies the type of business—a classification system that allows the Bank to identify, for example, every customer who has ever made a purchase at a firearms dealer, a bookstore, or to donate to a political campaign or cause.

44.     In many instances, BoA's surveillance capabilities extend far beyond merchant category codes to itemized receipt-level data. As both a retail bank serving consumers and a major merchant payment processor through Bank of America Merchant Services, the Bank occupies both sides of millions of daily transactions. When a BoA customer uses their debit card or credit card at a retailer whose

payments BoA also processes, the Bank possesses matching transaction identifiers on both ends—and for merchants obtaining and/or transmitting Level III data to a third party (which includes product descriptions, SKUs, quantities, and unit prices),[10] upon information and belief, BoA would have the ability to access this information and cross-reference these records to determine not merely that a customer shopped at a book store for a religious text or firearms dealer, but precisely which religious text or firearm they purchased, how much ammunition, and what accessories.

45.    In addition to raw, detailed transaction data, BoA captures and retains extensive biometric data across its customer touchpoints. Virtually every ATM transaction is recorded by camera systems that capture facial images, and these images can be matched against the cardholder's identity through the account being accessed.

---

[10] Upon information and belief, BoA currently accepts Level I and Level II data but does not currently accept Level III data; however, a merchant who has the capability to transmit Level III data can use an external third party to receive the information. *See, e.g.*, *Bank of America Gateway Level II and Level III Data*, https://merchanthelp.bankofamerica.com/Bank_of_America_Gateway_Level_II_and_Level_III_ Data#:~:text=What's%20in%20this%20article?,not%20supported%20at%20this%20time (last visited December 9, 2025) (noting that BoA's systems do not currently support Level III data). BoA would likely have the contractual ability, however, to access Level III information from either the merchant or supplier itself or from the third-party provider, and would any event receive Level I and Level II data directly.

46. Bank branch visits are similarly recorded through comprehensive video surveillance systems that capture customers from entry to exit, including at teller windows and during meetings with bank personnel.

47. Telephone interactions with customer service can be and often are recorded—including the voice biometric data that result in unique "voiceprints" for speaker identification—and upon information and belief BoA has implemented voice authentication systems that analyze vocal patterns to verify identity, meaning the Bank maintains a database of customers' biometric voice signatures.

48. Mobile banking applications, which has at least 20 million active users as of 3Q25,[11] may also capture facial recognition data or fingerprint biometrics for authentication purposes, and behavioral biometrics—the unique patterns in how a customer types, swipes, holds their device, or navigates the application—are increasingly used for fraud detection and identity verification.

49. BoA also captures comprehensive digital telemetry from online and mobile banking sessions: device identifiers, browser fingerprints, IP addresses with associated geolocation, clickstream data showing every page visited and product researched, session duration and timing patterns, and the full content of secure

---

[11] BoA Investor Presentation Deck, at 273 (November 2025) (noting that the Erica Platform has over 20 million active users).

messages exchanged through the Banking platform, all of which are linked to the customer's profile.

50.    BoA supplements its internal data with extensive third-party intelligence, including credit bureau records, ChexSystems banking history, LexisNexis or similar identity verification data, public records databases, and information purchased from commercial data brokers—creating a profile that extends far beyond the customer's direct or transactional interactions with the Bank.

51.    When aggregated, these data streams provide BoA with the ability to identify a customer by their face, voice, fingerprint, personal signature or behavioral patterns; to know their physical location when accessing accounts; to reconstruct their movements through branch visits and ATM, bank card, credit card, and peer-to-peer transaction usage; and to understand their interests and intentions through their browsing behavior, purchase history with MCC codes and the memo lines on their personal checks and as part of peer-to-peer payments.

52.    BoA supplements this ability by collecting and retaining detailed behavioral data on its customers and by drawing inferences and creating profiles of its customers "reflecting their preferences, characteristics, psychological trends, predispositions, behavior, and attitudes, intelligence, abilities, and aptitudes."[12]

---

[12]    BoA California Consumer Privacy Act (CCPA) Disclosure, https://web.bankofamerica.com/en/privacy/ccpa-disclosure (last visited December 9, 2025).

53.    Beyond raw and aggregated data, Bank of America generates derived intelligence through its artificial intelligence and machine learning systems. These systems produce customer risk scores that quantify the perceived threat level of each account holder, and BoA can input data to impact the scoring of behavioral patterns and define or re-define what constitutes "normal" transaction activity for each customer, enabling the detection of deviations. Said differently, BoA can (and did) intentionally alter the system to the create "suspicion" based on customer habits and preferences input by BoA, when there otherwise would not have been any suspicion based on traditionally recognized transaction thresholds and anomalies.

54.    BoA's network analysis capabilities can also link customers to other individuals and entities based on transaction flows, shared addresses, or common merchants. Geographic movement patterns are constructed from the locations where customers conduct transactions, effectively tracking their physical movements through financial data. Purchasing patterns are analyzed by merchant category, allowing the Bank to build vast and comprehensive profiles of each customer's interests, habits, hobbies, preferences and affiliations.

55.    When a consumer adds a BoA card to Apple Wallet, Apple shares—and BoA receives—a remarkably comprehensive data package that extends far beyond a card number and cardholder name. According to Apple's legal privacy documentation, BoA receives general information about the consumer's Apple

Account activity, including whether they have a long history of transactions within iTunes and the App Store—effectively giving the Bank a window into the consumer's digital purchasing behavior within the Apple ecosystem.

56.    The Bank also receives detailed device information including the device identifier, phone number associated with the device, and the name and model of both the primary device and any paired devices such as an Apple Watch. If the consumer has Location Services enabled, Apple shares the consumer's location at the time they add the card, giving the Bank a precise geographic fix on where the provisioning occurred. Additionally, Apple provides aggregated statistics relating to other payment cards the consumer has added or attempted to add to Apple Pay, potentially revealing information about the consumer's relationships with competing financial institutions.

57.    Beyond static account and device information, Apple shares behavioral analytics derived from how the consumer uses their device. Apple's documentation states that "device use patterns—such as the percent of time the device is in motion and the approximate number of calls you make per week" may be provided to the card issuer to determine eligibility and prevent fraud. This means BoA can learn not just what device a customer owns, but how they use it: whether they are frequently mobile or stationary, whether they are heavy or light phone users, and by inference, aspects of their lifestyle and daily patterns. Apple computes what it calls a "device

trust score" from these behavioral signals, and information contributing to that score—including the approximate number of phone calls and emails the consumer sends and receives—is provided to the Bank. BoA also learns whether certain device settings are enabled, which could include security settings, location services, and other configuration details.

58.     The process also reveals information the consumer might consider sensitive or private. Apple's documentation indicates that "account-related information and paired-device details" are shared with the card issuer, meaning BoA learns about the broader constellation of Apple devices associated with the consumer's Apple Account. BoA receives information about how long an Apple Account has existed and whether there have been recent changes to account data—signals that might indicate either a new customer or potential fraud, but which also tell the Bank about the consumer's digital history and stability. When considered in totality, adding a BoA card to Apple Wallet or downloading a BoA-proprietary app transforms what would otherwise be a simple plastic card with a magnetic stripe into a conduit for sharing intimate details about the consumer's device ecosystem, behavioral patterns, geographic location, communication frequency, and digital purchasing history—none of which the Bank would have any access to through traditional card issuance or banking relationship.

## II.    How BoA Builds Its Surveillance Database

### A.    AI-Powered Data Mining Infrastructure

59.    Armed with this data that touches every intimate detail of a customer's life, BoA has openly touted its surveillance capabilities and massive technological infrastructure to investors and the public.

60.    According to CEO Brian Moynihan's November 2025 investor presentation, BoA runs 270 artificial intelligence and machine learning models across its business operations.[13] The models are trained on the Bank's vast repository of customer transaction data, described above. What was once a system designed to only flag transaction-based anomalies based on monetary thresholds, has now become a system that ingests every conceivable detail of a person's personal life and behaviors that the Bank uses more generally and ostensibly for marketing and sales purposes, but which use also has a more sinister, unlawful side as explained in this Complaint.

61.    To this end, the Bank holds more AI and machine learning patents than any other financial services company—1,500 patents and pending applications as of

---

[13] *See* BoA Investor Presentation (November 2025) (the "2025 Investor Presentation"). BoA's November 2025 Investor Presentation is available at https://investor.bankofamerica.com/events-and-presentations/investor-day (last visited December 8, 2025), and a copy of the slide deck used for BoA's November 2025 investor presentation is available at https://d1io3yog0oux5.cloudfront.net/_bb2c53e5895bac658ce9e9ece357749a/bankofamerica/db/780/10456/pdf/BofAInvestorDay_FullPresentation_ADA.pdf (last visited December 8, 2025).

late 2024,[14] and set a record-breaking year for patents in 2021.[15] These patents cover data analytics, behavioral analytics, and predictive modeling technologies that use every facet of a person's life, location and behaviors.

62.    BoA invests approximately $13 billion per year in this technology, with $4 billion directed specifically to new technology initiatives.[16] To put this in perspective, this technology budget far exceeds the entire annual budgets of many federal agencies. The Bank employs over 7,500 technology personnel and 18,000 software developers across 14 countries dedicated to developing new data processing and analysis capabilities.[17]

### B.    How BoA Uses Its Trove of Data and With Whom It Shares This Data

---

[14]   Bank of America Press Release, *AI Patents at BofA Increase 94% Since 2022*, https://newsroom.bankofamerica.com/content/newsroom/press-releases/2024/10/ai-patents-at-bofa-increase-94--since-2022.html (last visited December 8, 2025).

[15] For avoidance of doubt, BoA's technological capability was equally as sophisticated in 2021 at the beginning of the class period as it is at the end of the class period. *See*, *e.g.*, BoA, *Bank of America Sets Record-Breaking Year for Patents in 2021* (February 24, 2022) (touting that BoA had moved from 106th to 86th on the World's moved from 106th to 86th on the Intellectual Property Owners Association's Top 300 list of patent owners (PDF) for patents that included a meaningful percentage of patents dedicated to data mining and analytics.)

[16] *See* BoA 2025 Investor Presentation. BoA's tech spend for FY2021was even greater, with almost $14 million in total spend. *See*, *e.g.*, Banking Dive, *Bank of America nets record 227 patents in first half of 2021* (August 20, 2021), https://www.bankingdive.com/news/bank-of-america-nets-record-227-patents-in-first-half-of-2021/605346/ (last visited January 5, 2026).

[17] *See id.*

63.    What does BoA do with this vast amount of customer data and its capabilities? First and foremost, according to David Tyrie, BoA's Chief Digital Officer and Head of Global Marketing, "We use it. We use it every single day."[18]

64.    In addition to analyzing the data and creating behavioral profiles and surveillance dossiers on each of its customers, BoA uses the data to maintain and service accounts and process transactions, as well as to engage in advertising and marketing services.

65.    The information is also shared with third party platforms. For example, BoA historically utilized enterprise anti-money laundering platforms from vendors such as NICE Actimize, which provide sophisticated capabilities for scanning transaction databases, identifying patterns, and generating alerts. These commercial platforms, now combined with BoA's own revenue-generating technology, can be configured to search for virtually any combination of transaction attributes, geographic locations, merchant categories, and customer characteristics. They are designed to process millions of transactions in real time, applying complex rule sets and machine learning models to identify activity based on inputs that BoA codes as supposedly warranting further investigation.

---

[18] *Id*. Notably, for all the extensive airtime BoA spent in its investor presentation touting its vast data stores and ability to analyze and use customer financial and behavioral data, it spent exactly zero time addressing what measures, if any, it takes to protect and maintain the privacy of its 69 million individual and small business customers. This is a testament to BoA's lack of commitment or concern for its customer's privacy rights.

66.     Relevant to the allegations in this Complaint, BoA also shares data with FinCEN's system, which grants direct access to, among others, thousands of federal, state and local law enforcement agencies and government agents, intelligence agencies, and the Office of Inspector General of the Treasury.

67.     For context, in 2023, there were 14,415 registered and authorized users with direct access to the FinCEN database in which BoA shared private financial information over lawful customer activity, and an estimated 27,000 authorized users of the FinCEN Agency Integrated Access database.

68.     FinCEN estimates 472 federal, state and local law enforcement, regulatory and national security agencies have access to BSA reports.

## III.   BoA Deploys Its Breathtaking Surveillance Capabilities in January 2021 to Engage in a Massive, Systematic, and Coordinated Surveillance Operation on Its Own Customers

### A.     The Initial Voluntary Search and Disclosure (January 7-8, 2021)

#### 1.     BoA's Targeted Search and Surveillance

69.     The whistleblower testimony and House Judiciary findings revealed the specific capabilities of BoA's powerful technology and vast data collection practices in the days following January 6, 2021.

70.     Of their own accord, the Bank executed geographic transaction queries of its entire customer base to identify all customers who conducted any transaction in a defined geographic area—the District of Columbia, Maryland, and Virginia—

25

during a specified date range of January 5 through 7, 2021. This query alone would have returned an enormous number of customers, as many Americans live in or travel through the Washington metropolitan area on any given day.[19]

71.    To prioritize customers, BoA then executed historical merchant category queries that cross-referenced the geographic results against historical purchases at merchants in specific categories—specifically, firearms vendors.[20] Critically, this historical search had no temporal limitation. Purchases from years or even decades earlier could be retrieved and matched against the geographic data.

72.    BoA applied composite scoring that combined these multiple query results to "elevate" certain customers to the top of the resulting list. The elevation criteria had nothing to do with suspicious transaction patterns. A customer rose to the top of the list not because their transactions exhibited characteristics of money laundering or fraud, but because they had been in Washington and had, at some point

---

[19] March Interim Report, at 5, citing and quoting the testimony of FBI Supervisory Intelligence Analyst George Hill:

> The Bank of America, with no directive from the FBI, data-mined its customer base. And they data-mined a data range of 5 to 7 January [of 2021] any BOA customer who used a BOA product. And by 'BOA product,' I mean a debit card or a credit card. They compiled that list. And then, on top of that list, they put anyone who had purchased a firearm during any date. So it was a huge list."

March Interim Report, at 5 (citing Transcribed Interview of Mr. George Hill (February 7, 2023) and corroborating interview of Mr. Joseph Bonavolonta). These transcribed interviews have not been made publicly available.

[20] *Id*. at 6 (citing Bonavolonta Testimony, at 17, noting that BoA's list included purchases made at "gun shops, or, you know, stores that would sell firearms.").

in their lives, purchased what may have been a firearm or other weapon from a vendor that sells firearms, such as Cabela's, Bass Pro Shop, or Dick's Sporting Goods.

73.    Notably, these lists were created from scratch based on search parameters using location and purchase history. Nowhere present were the paradigmatic indicators of "suspicious transactions" as contemplated by the BSA (as explained below). BoA did not use the talismanic or statutory monetary thresholds as a search parameter. BoA did not analyze the transactions to determine if they were being structured to come in just below the set monetary thresholds. BoA's sophisticated system, in fact, did not appear to automatically flag these transactions as suspicious at all. Instead, BoA actively developed search parameters outside of the talismanic BSA indicators, and outside of the SAR categories and characterizations, and searched its entire customer database using behavior and location of lawful, constitutionally protected activities.

### 2.    BoA's Unlawful Disclosure

74.    Finally, the Bank executed bulk data export operations that packaged and transmitted customer lists containing financial records to law enforcement without individual warrants, subpoenas, or any form of legal process directed at the specific individuals identified.

75.    According to the transcribed interview of George Hill, a retired FBI Supervisory Intelligence Analyst who was based in the Boston Field Office in 2021, BoA provided the FBI Washington Field Office with a "huge list" on January 7 or 8, 2021—within 48 hours of the Capitol breach. BoA produced this list after it proactively data-mined—i.e, "searched"—its customers and delivered the results to law enforcement without being asked.[21]

76.    The whistleblower testified that the list included all customers who used BoA credit or debit cards in the D.C., Maryland, or Virginia area on January 5, 6, or 7, 2021. BoA then elevated to the top of the list anyone who had "purchased a firearm during any date" with a BoA product—with no geographic or temporal limitation on the firearm purchases.[22]

77.    Hill provided a concrete example that illustrates the breadth of this surveillance: A customer who "purchased a shotgun in 1999" in Iowa would "rise to the top of that list" if they used their BoA card in Northern Virginia on January 5, 2021.[23] The firearm purchase could have occurred decades earlier, thousands of miles away, for purposes entirely unrelated to any criminal activity—hunting, sport

---

[21] *Id*. at 5.

[22] *Id.*

[23] Cleveland, Margaret, *Whistleblower: FBI's D.C. Office Tried To Sic Local Agents On Innocents After Bank Of America Volunteered Gun Records*, The Federalist (March 6, 2023) (citing to unspecified pages of the Hill Testimony), https://thefederalist.com/2023/03/06/whistleblower-fbis-d-c-office-tried-to-sic-local-agents-on-innocents-after-bank-of-america-volunteered-gun-records/ (last visited December 8, 2025).

shooting, home defense—and yet that customer would be flagged and elevated for FBI attention based on nothing more than geographic coincidence.

78.     Notably, Hill testified that the FBI's Boston Field Office refused to open investigations based on this BoA data, recognizing that there was "no predication, there's no crime that was committed by using a BoA product in the District."[24]

79.     Upon information and belief, the initial "huge list" and information provided to the FBI was not provided in the form of a SAR, through typical SAR-reporting channels or pursuant to any recognized exception to the RFPA, and was in fact retracted from the FBI's database out of concern for its overreach.

**B.     The Formalized FBI-Bank Coordination (January 15, 2021)**

80.     One week after BoA's voluntary disclosure, the relationship became formalized. According to the transcribed interview of Peter Sullivan, the FBI's Senior Private Sector Partner for Outreach, Sullivan and BoA representatives "brainstormed" specific thresholds for SAR filings. This was not law enforcement directing a bank to comply with legal process; this was a collaborative session in which the FBI and BoA jointly developed criteria for identifying individuals of interest.

81.     Sullivan then sent an email to BoA on January 15, 2021 (documented in the House Judiciary investigation as Document Reference BofA-HJUD-

---

[24] *Id.*

00000002) providing law enforcement developed and approved search parameters. These parameters included Washington D.C. purchases between January 5 and 6, 2021; purchases made for hotel or Airbnb reservations in the D.C., Maryland, or Virginia area; and any historical purchase going back six months generally for weapons or weapons-related vendor purchases.

82.    Using these FBI-provided criteria, BoA then filed a SAR identifying 211 individuals. These 211 Americans were reported to law enforcement not because their transactions exhibited traditional money laundering indicators, not because they structured deposits or moved funds through shell companies, but because they matched the law enforcement's desired demographic and geographic profile.

83.    This filing was part of a joint effort between BoA, and not just the FBI, but also all other federal, state and local law enforcement agencies with access to the data.

### C.    The Broader FinCEN Coordination

84.    The House Judiciary investigation revealed that the coordination extended beyond this initial cooperative effort between BoA and law enforcement, and how BoA entered formal and informal agreements with other agencies to monitor customer transactions and develop algorithms and coordinated searches of its customer using constitutionally protected activities that had no legitimate nexus to a crime or unlawful conduct.

30

85.    These agreements went beyond the BSA's SAR filing requirement, and instead BoA agreed to conduct broad surveillance of customer transactions and coordinated with government agencies to develop criteria.

86.    On January 8, 2021, the Financial Crimes Enforcement Network convened a call with the FBI and representatives from 30 to 50 financial institutions, including BoA.

87.    Following this call, FinCEN, as part of a joint effort and on behalf of the 472 federal, state and local agencies who share the database with the financial institutions, circulated search parameters, typologies, and Merchant Category Codes (MCCs) to be used for identifying potential "domestic violent extremists." The materials instructed banks, like BoA, to search Zelle payments for the terms "MAGA," PREZ," "PRESIDENT," "KAMALA," "BIDEN," "AMERICA FIRST," "PELOSI," "PENCE" and "TRUMP."[25]

88.    The criteria included "the purchase of books (including religious texts)" as a potential indicator of extremism and flagged "transportation charges, such as bus tickets, rental cars, or plane tickets, for travel to areas with no apparent purpose" as suspicious.[26]

---

[25] March Staff Report, at 23 (citing HJC118_0000006).

[26] *See id*. Notably, the criteria gave no indication how a financial institution could possibly know the purpose (or lack thereof) of a customer's travel other than sheer guesswork.

89.    They provided specific merchant IDs and MCCs to query, including MCC 3484 for "Small Arms," MCC 5091 for "Sporting and Recreational Goods and Supplies," MCC 5933 for "Pawn Shops," and MCC 5941 "Sporting Goods Stores."[27]

90.    The criteria also included exceedingly broad "catchall" MCCs as indicative of supposedly suspicious behavior, including MCC 5099 for "Durable Goods, Not Elsewhere Classified," MCC 5999 "Miscellaneous and Specialty Retail Shops," and MCC 7999, "Recreation Services, Not Elsewhere Classified."[28]

91.    They named specific retailers to flag, including Academy, Backcountry World, Cabela's, Dick's Sporting Goods, and Bass Pro Shops.[29]

92.    The search parameters and process went further still with proposals for the misuse of SARs and Section 314(a) requests to "canvas the nation's financial institutions for potential lead information" from "more than 37,000 points of contact at more than 16,000 financial institutions." Vendor lists for airports in the Washington metropolitan area, Union Station, and bus stops were also circulated among the largest banks.

---

[27] *See id.*

[28] *See id.*

[29] *See id.* at 27.

93.    BoA, among other financial institutions, was directed to, and upon information and belief did, as a *de facto* arm and in a joint effort with federal, state and law enforcement agencies search for other benign transactions that lack any suspicion or criminal nexus to money-laundering or counter-terrorism, including recent purchases of supposedly "covert/secure communications equipment" such as "Virtual Private Networks (VPNs), online gaming, prepaid phones/calling cards," "any recent storage facilities," "other excess transactions" such as "hardware, beauty supply, auto parts, electronics, machinist/engineering, gym/martial arts, political donations/materials, religious donations/materials, work uniforms."[30]

94.    Even a person who recently purchased life insurance, closed a bank account or had a "life stress indicator" such as "no payroll deposits," "medical expenses," or "health challenges" was not safe from suspicion as a money-launderer or terrorist.[31]

95.    BoA was also instructed to, and upon information and belief, did search for supposed "hate groups" who have no known or historic association with money-laundering or counter-terrorism.[32]

---

[30] *Id.*

[31] *See id.* at 27-28.

[32] *See id.* at 33.

33

96.    The Interim Staff Report further noted that the SAR filing process was jointly manipulated by government law enforcement agencies and financial institutions whereby financial institutions were acting as *de facto* arms of federal, state and local law enforcement, voluntarily or at the request of federal, state and local law enforcement and without legal process, to search and report lawful activities that were associated with the affiliation of a disfavored political party.

97.    The targeting of supposedly "suspicious" activities went far beyond anything related to the BSA's statutory purpose of money laundering and terrorist financing.

**D.    BoA's Illicit Conduct Constituted Illicit Surveillance, Not Simple Transaction Monitoring**

**1.    What the Bank Secrecy Act Was Designed to Detect**

98.    In an effort to insulate itself from responsibility for its blatant violations and utter disregard for the privacy and rights of its entire customer base, BoA will assuredly lean into a distortion of the Bank Secrecy Act's provisions and intent. As explained below, any such reliance is misplaced and disingenuous because BoA's actions stand well outside of the permissible contours of the BSA.

99.    BoA engaged in voluntary data-mining beyond SAR-triggering scenarios resulting in proactive, unreasonable searching and surveillance, rather than transaction-based anomaly detection. In doing so, BoA violated the RFPA,

unlawfully converted customer property and infringed on Plaintiff's and the Class members' constitutional rights.

100.    The BSA and its implementing regulations require financial institutions to monitor for suspicious transactions—financial activity that exhibits characteristics indicative of money laundering, terrorist financing, or other financial crimes.

101.    The BSA governs a limited category of transactions at or over a certain monetary threshold and that also share key characteristics or patterns typical of transactions that involve money-laundering and/or the financing of counter-terrorism, and reporting is required for transactions at or above certain required thresholds.

102.    There are two categories of reports that financial institutions are required and/or authorized to file. One report is a Currency Transaction Report (CTR), the other is a Suspicious Activity Report (SAR). Both reports use financial thresholds to trigger a filing requirement.

103.    More specifically, a financial institution is required to file a CTR for transactions that equal or exceed $10,000.[33]

104.    A financial institution must file a SAR when a transaction involves or aggregates funds of $5,000 or more, ***and*** if the institution "knows, suspects, or has

---

[33] *See* 31 C.F.R § 1010.330.

reason to know" that the transaction involved funds derived from illegal activity, was designed to evade reporting requirements, lacked a lawful purpose or was involved use of the Bank to facilitate criminal activity.[34]

105.   Legitimate transaction monitoring by a bank also looks for structuring, which occurs when individuals break large cash deposits into smaller amounts specifically to avoid triggering the monetary thresholds,[35] or looks for unusual patterns—transactions that are inconsistent with a customer's normal activity or stated business purpose. Legitimate transaction monitoring also identifies rapid movement of funds, where money moves quickly through accounts without any apparent business reason, suggesting it may be layered to obscure its origins.

106. It also flags transactions involving high-risk jurisdictions—not Washington, D.C.—but countries known to have weak anti-money laundering controls where illicit funds are commonly hidden. It detects shell company indicators, where funds flow through entities that have no apparent business operations and exist only to obscure beneficial ownership.

107.   Based on the FFIEC BSA/AML Examination Manual and FinCEN guidance, *legitimate* suspicious activity indicators—the kind of transaction-based anomalies the Bank Secrecy Act was designed to detect and the types that the BSA

---

[34] 31 C.F.R. § 1020.320(a)(2).

[35] 31 C.F.R. § 1010.330.

authorizes a financial institution to report—are threshold-based or transactions that appear designed to avoid designated thresholds or where customers are using an account not for its stated purpose.[36]

108.    The BSA provides a limited safe harbor for financial institutions that file SARs and other reports "in good faith" and/or in accordance with the limited statutory authority granted to banks.[37] The BSA safe harbor protects financial institutions from civil liability to customers only when reports are filed in good faith and in accordance with the BSA's requirements.

109.    The safe harbor does not protect financial institutions that file SARs as part of a coordinated program with law enforcement to conduct mass surveillance, or that file SARs based on criteria developed in conjunction with government agencies to target disfavored groups, or that file SARs voluntarily based on lawful activity and constitutionally protected conduct rather than genuine indicia of potentially criminal activity.

110.    Moreover, good faith is a fundamental and essential element of safe harbor protection. Financial institutions that file reports without a genuine basis for

---

[36] *See* FFIEC BSA/AML Examination Manual, Appendix F: Money Laundering and Terrorist Financing Red Flags, https://bsaaml.ffiec.gov/manual/Appendices/07; *see also* FinCEN Advisory FIN-2010-A001, "Advisory to Financial Institutions on Filing Suspicious Activity Reports regarding Trade-Based Money Laundering," https://www.fincen.gov/resources/advisories/fincen-advisory-fin-2010-a001; FinCEN, "Suspicious Activity Reporting Requirements" (Reference Guide), https://www.fincen.gov/system/files/shared/report_reference.pdf.

[37] *See* 31 U.S.C. § 5318(g)(3).

suspicion or for improper purposes are not entitled to safe harbor protection and remain liable for violations of the RFPA and other applicable laws.

111.   Neither the BSA nor the PATRIOT Act authorizes financial institutions to disclose customer information beyond the specific categories of reports contemplated by those statutes, nor do they eliminate the good faith requirement for safe harbor protection.[38]

112.   The circumstances under which a bank may permissibly file a SAR are circumscribed by not only the enabling statute, but also by Article IV of the U.S. Constitution and the RFPA.[39]

113.   Indeed, the BSA and PATRIOT Act must be viewed alongside the broad protects afforded to consumers, and the unambiguous restrictions placed on financial institutions, in the Right to Financial Privacy Act of 1978 (RFPA).[40]

114.   The SAR filing statute and regulations were never intended or written to be an open-ended pretext for a bank to search its entire customer database or share the financial records of customers engaging in activities that are below the established monetary thresholds and carry no indicia of unlawful conduct.[41]

---

[38] *See* OCC Bulletin, 2025-23.

[39] *See* OCC Bulletin 2025-23.

[40] *See id.*

[41] OCC Bulletin 2025-23, Protecting Customer Financial Record (September 8, 2025) (cautioning banks that they are prohibited from "us[ing] voluntary SARs as a pretext to improperly disclose customers' financial information or evade the RFPA.").

115.   The SAR rules instead impose circumscribed, carefully-defined and limited obligations on financial institutions to identify genuine suspicious transactions based on objective indicia of potential money laundering or counter-terrorism.[42]

116.   The SAR regulations do not authorize financial institutions to act as government agents conducting mass surveillance of customers based on political views or location.[43] The SAR regulations similarly do not authorize financial institutions to file SARs based on lawful purchases and constitutionally protected activities.[44]

117.   Yet, this is what BoA did. The transaction-based anomaly detection governed by the BSA focuses on what the ***money is doing***—not what the ***person is doing***. None of these indicators involve:

- Where customers traveled;

- What political views they hold;

- Whether they own or purchased a firearm at any time in their lives;

- Whether they shop at certain stores;

---

[42] *See id.* (reminding banks that they "should only submit a voluntary SAR where it identifies concrete suspicious activity, such as activity that could form the basis for filing a SAR except that it is under the applicable threshold.").

[43] *Id.*

[44] *Id.*

- What items they purchase from stores with no nexus whatsoever to criminal conduct, such as Dick's Sporting Goods or Cabela's;

- What books they purchased; or

- What keywords appear in their Zelle payment descriptions.

118. The BSA framework is built on the premise that *transactions* become suspicious when they deviate from expected patterns or lack apparent lawful purpose. BoA's January 2021 queries inverted this framework entirely—it started with people (those in a geographic area or with certain purchasing history) and worked backward, treating constitutionally protected conduct as inherently suspicious regardless of whether any actual transaction-based anomaly existed.

### 2.    What BoA Actually Did

119. Instead of asking "which transactions look suspicious," in its voluntary disclosures, BoA asked three very different questions.

120. First, BoA essentially asked: "Who was in Washington?" This was a geographic query of its entire customer base that flagged customers based solely on their physical location, as evidenced by transaction data, during a three-day period irrespective of monetary thresholds or evidence of structuring. Being in Washington, D.C. during the first week of January is not suspicious. Millions of Americans live there. Millions more visit for business, tourism, family or to participate in political activities protected by the First Amendment. This query was also lacking in

particularity as required by the Fourth Amendment and reflects an inexplicable prejudice and animus towards a group of people.

121.  Second, BoA essentially asked: "Who owns a gun or small weapon?" This was a historical query that searched for any indicia that a customer in D.C. had ever purchased from a vendor known to sell small arms or weapons-related items (such as ammunition) using any BoA product, regardless of when or where that purchase occurred or whether the transaction hit a monetary reporting threshold or there was evidence of structuring. Purchasing a firearm or weapon is not suspicious. It is an activity explicitly protected by the Second Amendment to the United States Constitution. This query was also lacking in particularity as required by the Fourth Amendment and reflects an inexplicable prejudice and animus towards a group of people who were exercising their rights under the Second Amendment. The Bank prioritized these individuals not because their transactions met or were just below a monetary threshold and not because the transactions exhibited paradigmatic hallmarks of financial crime, but instead because they had exercised constitutional rights: the right to travel, the right to keep and bear arms, or perhaps a right to protect or freely associate with a political party or religious group.

122.  In its subsequent surveillance, searches and disclosures—which were coordinated with government agencies, law enforcement and other financial institutions—BoA went far outside of the permissible scope of the BSA to target

41

where customers shopped using retailers with no nexus to criminal conduct, what they purchased using broad MCC codes with no nexus to criminal conduct, and political affiliation regardless of whether a customer was in the Washington, D.C. area during January 6, 2021.

### 3. The Right to Financial Privacy Act of 1978

123.    The Right to Financial Privacy Act of 1978 was enacted upon Congress' determination that customer financial records required statutory protection from government access.

124.    The legislative history of the RFPA reveals Congress's deep concern about the potential for government abuse. As the House Report accompanying the RFPA explained, the legislation was necessary because "both the confidentiality of financial records and the constitutional rights of citizens would be severely threatened" without statutory protection.[45]

125.    Congress found that "financial institutions have, in the past, disclosed financial information to Federal enforcement agencies without notification to or

---

[45] H.R. Rep. No. 95-1383 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9273. The legislative history also makes clear that Congress intended the RFPA to prevent exactly the kind of systematic surveillance performed by BoA. Congress was concerned that without statutory protection, financial institutions would become "*de facto* agents of law enforcement" and that Americans' financial records would be subject to warrantless government scrutiny. The RFPA was designed to ensure that government access to financial records would be subject to meaningful procedural safeguards, including notice to the affected customer and an opportunity for judicial review.

permission of the customer," and that "such actions threaten the privacy of individuals and their families."[46]

126.   The RFPA establishes comprehensive procedural safeguards that government agencies must follow when seeking access to customer financial records held by financial institutions.

127.   Under 18 U.S.C. § 3403(a), the RFPA expressly prohibits "financial institutions . . . or agents of financial institutions" from providing a government agency with access to any customer's financial records unless the customer is first given notice and the opportunity to object.

128.   A government authority may obtain financial records only through specific legal mechanisms: an administrative subpoena or summons authorized by law and meeting certain requirements; a search warrant; a judicial subpoena; or a formal written request with customer authorization.

129.   Each of these mechanisms requires individualized legal process directed at specific customers whose records are sought.

130.   The statute does not permit bulk access to customer financial records or ongoing database access for general investigative or surveillance purposes.

---

[46] *Id.*

131.   Central to the RFPA's protections is the requirement of customer notice and certification.[47]

132.   Under 12 U.S.C. §§ 3402 and 3405, when a government authority seeks financial records using an administrative subpoena or summons, the customer must receive notice and have the right to challenge the request in court before the records are disclosed.

133.   The government agency must serve the customer with a copy of its request or order, or mail a copy to the customer on or before the date which it serves the order or delivers or mails the request to the financial institution maintaining the records. The customer then has 10 days from the date of service, or 14 days from the date of mailing, to challenge the requested disclosure.

134.   A financial institution may not release customer financial records unless the Government authority seeking such records certifies in writing to the financial institution that it has complied with the applicable provisions of the RFPA.

---

[47] The RFPA contains limited exceptions to its notice and legal process requirements, but none of these exceptions authorize the type of bulk search and disclosure arrangement at issue in this case. Under 12 U.S.C. § 3413, financial institutions may disclose records without individualized legal process for narrowly defined purposes such as examination by banking regulators, transfer of information to other financial institutions in connection with legitimate financial transactions, and response to requests for information about a customer's account balance when the government seeks to collect a debt owed to the United States. Notably, Congress did not include any exception for bulk access to customer records for law enforcement, national security, or border control purposes. The statutory scheme contemplates that even when government agencies have legitimate investigative or security concerns, they must seek customer records with particularly, based on cause, and through appropriate legal process on an individualized basis with customer notice.

135.   This certification requirement ensures that financial institutions do not become unwitting accomplices to privacy violations. The notice requirement also ensures that customers have an opportunity to assert their rights and challenge government access to their private financial information before disclosure occurs.

136.   Under 12 U.S.C. § 3401(1). the RFPA defines "financial institution" as "any office of a bank, savings bank, card issuer as defined in section 1602(n) of Title 15, industrial loan company, trust company, savings association, building and loan, or homestead association (including cooperative banks), credit union, or consumer finance institution."

137.   The RFPA defines "customer" under 12 U.S.C. § 3401(5) to mean "any person or authorized representative of that person who utilized or is utilizing any service of a financial institution, or for whom a financial institution is acting or has acted as a fiduciary, in relation to an account maintained in the person's name."

138.   The RFPA protects individuals and partnerships of five or fewer individuals.

139.   The RFPA defines "financial record" under 12 U.S.C. § 3401(2) as "an original of, a copy of, or information known to have been derived from, any record held by a financial institution pertaining to a customer's relationship with the financial institution."

140.   This definition is intentionally broad and encompasses transaction records, payment information, account statements, and other information maintained by financial institutions about their customers' financial activities.

141.   The RFPA provides a private right of action for customers whose financial records are disclosed to a governmental agency by a financial institution or its agent in violation of the statute.[48]

142.   Under 12 U.S.C. § 3417, a customer may bring a civil action against a financial institution or government authority that violates the Act.

143.   The statute provides for actual damages plus attorney's fees and costs, and statutory damages of $100 per violation where no economic damages are shown.

144.   These remedies serve both to compensate injured customers and to deter financial institutions from disregarding their statutory obligations.

145.   The statute also authorizes punitive damages where violations are willful or intentional.

---

[48] Notably, the RFPA was **not** repealed with the enactment or amendments to the BSA. BoA cannot use SAR reporting to evade its obligations under the RFPA. Even BoA's regulatory agency has warned BoA that it has a legal obligation to protect its customers' financial records under the Right to Financial Privacy Act (RFPA), and to remind them about the proper (or rather improper) use of SAR filings. OCC Bulletin 2025-23, *Protecting Customer Financial Records* (September 8, 2025), https://www.occ.treas.gov/news-issuances/bulletins/2025/bulletin-2025-23.html     (last     visited December 8, 2025).

146.   By the Act's express terms, actual harm is not required to recover damages under the Act. Congress included these robust remedies because it recognized that only meaningful civil liability would ensure compliance with the RFPA's protections.

### 4.     Privacy Rights and Injury-in-Fact

147.   The fact that the RFPA does not require proof of economic harm should not be taken to mean that Plaintiff and the Class have not suffered an injury-in-fact.

148.   To the contrary, Plaintiff and the Class have suffered an injury-in-fact and their privacy and property rights has been violated.

149.   Plaintiff and members of the Class opened and maintained accounts with BoA for the purpose of conducting ordinary financial transactions necessary for participation in modern economic life.

150.   Plaintiff and the Class had and have no practical alternative to maintaining a banking relationship.

151.   At no point did Plaintiff consent to BoA's comprehensive collection, retention, or disclosure of a comprehensive record of Plaintiff's purchases, movements, associations, behavior, transactions, analytics and/or activities spanning decades.

152.   Plaintiff had no knowledge that BoA maintained records of specific categories of purchases dating back for decades.

47

153.   Plaintiff and the Class had no ability to control the vast amount of data BoA collects, how long BoA retains that data, or how BoA uses categorizes, analyzes, cross-references or shares that data.

154.   Plaintiff and the Class had no ability to meaningfully opt out of BoA's data collection practices while continuing to maintain the banking relationship necessary for Plaintiff's economic participation in modern-day life.

155.   BoA's account agreements, disclosures, and privacy notices failed to inform Plaintiff or the Class that BofA would maintain and analyze the types of data that they maintain, correlate those records with geographic transaction and/or biometric data, or voluntarily provide such information to law enforcement without legal process or a recognized exception.[49]

156.   BoA holds itself out to customers, including Plaintiff and the Class, as a trustworthy custodian of sensitive financial information.

157.   BoA advertises its security measures and privacy protections as reasons for customers to entrust their financial lives to the institution.

158.   Not only does BoA hold itself out as having enhanced security, BoA and the Uniform Commercial Code *require Plaintiff and the Class* to take affirmative steps to protect the privacy of account credentials, monitor account

---

[49] In its Privacy Policy, BoA did not disclose that it could or would voluntarily, and of their own accord, search for or provide financial records to government law enforcement.

statements, and report unauthorized transactions lest Plaintiff or members of the Class be held liable for a failure to safeguard account information in the event of fraudulent transactions are made on Plaintiff's account.

159.   These requirements and warnings conveyed to Plaintiff and the Class that their financial information was sensitive, valuable, and warranting of protection and privacy.

160.   Plaintiff understood that BoA was subject to federal and state laws restricting disclosure of customer financial information, especially the RFPA, and Plaintiff understood that such laws existed because financial records are private and sensitive.

161.   Reasonable people would never expect that BoA would, without legal process or government request, search its databases to identify customers based on locations in the United States or lawful purchases, flag those customers for special attention, and share their identities and financial records law enforcement.

162.   Reasonable people would never expect that a purchase made at any point in time at a location that sells items that include firearms, using a BoA product, would be retrieved, correlated with subsequent unrelated transactions, and used to place Plaintiff or members of the Class on a list provided to state and federal law enforcement.

163.   Plaintiff's and Class members' financial records with BoA, taken together, reveal intimate details of Plaintiff's life, including: behavioral data, where they traveled; where they stayed; what they purchased; what organizations they support through donations; what religious institutions they attend; what medical providers they visited and when; what publications they purchased and read; their individual voiceprints; their facial-recognition biometric data, and what constitutional rights they may have exercised.

164.   This information, accumulated over years of transactions, constitute a detailed and comprehensive portrait of Plaintiff's movements, associations, beliefs, and activities—a portrait that no single transaction or short-term record could reveal.

165.   At all times relevant to the Complaint, Plaintiff took steps to protect the privacy of this information. Plaintiff did not share account credentials. Plaintiff used secure methods to access accounts. Plaintiff reviewed statements for unauthorized activity. Plaintiff reasonably believed that by taking such precautions, and by entrusting financial information to a regulated banking institution, that information would remain private absent legal process and notice or consent.

166.   Society recognizes financial information as private and sensitive. Individuals do not voluntarily disclose their bank statements, credit card records, or purchase histories to strangers. Employers, landlords, and creditors require authorization before accessing an individual's financial records. The premise of

financial privacy is embedded in commercial practice, consumer expectation, and legal regulation.

167.   Plaintiff's and the Class members' expectation that BoA would not voluntarily disclose decades of financial records to law enforcement and governmental agencies—without legal process, without notice, and without any individualized suspicion of wrongdoing—was reasonable.

168.   For the above-described reasons and by virtue of the RFPA and other applicable law, Plaintiff and the Class have: (a) a property interest in their personal, financial and travel information, (b) a reasonable expectation of privacy and (c) have suffered an injury-in-fact as a result of Defendant's conduct.

169.   The financial records at issue serve as a unique fingerprint that contain biometric information and provide an intimate and detailed portrait of an individual's every move and their habits, purchases, hobbies, health issues, associations, religious beliefs and political affiliations.

170.   The "huge list" and subsequent information described in this Complaint that BoA made available to state and federal law enforcement and governmental agencies (and possibly other banks and private parties) provide an "intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Id*.

171.   By providing personal, financial and uniquely, deliberately targeted information about their customers' locations, purchases, political and religious associations, and even health, for, in some instances, a limitless period of time, government agencies and potentially others have been able to deduce a detailed log of Plaintiff's and the Class' movements, associations, and even health in combination with other information available to them.

172.   By disclosing this data, combined with additional information, BoA deliberately and with animus infringed on the privacy of Plaintiff and the Class and have caused injury in fact.

173.   Plaintiff and the Class had and continue to have a reasonable expectation of privacy in their physical movements, political and religious associations, their financial transaction history and detailed purchase history, and other private information.

174.   By virtue of the RFPA, state law, the common law and the Fourth Amendment of the United States Constitution, Plaintiff and the Class had and continue to have a reasonable expectation of privacy in their financial information.

175.   Further, Plaintiff and Class members own and possess a cognizable property interest in their personally-identifiable and financial information, including their name, address, and complete credit card data.

176.    "One of the main rights attaching to property is the right to exclude others." *People v. Stewart*, 113 Cal. App. 4th 242, 250 (2003) (quoting 2 William Blackstone, *Commentaries* 2 (1766) ("There is nothing which so generally strikes the imagination, and engages the affections of mankind, as the right of property; or that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe.") (cited with approval in *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1024 (N.D. Ca. 2024)).

177.    In collecting, long-term retention, searching for and sharing their personal, political, religious, location and financial data, Plaintiff and the Class were deprived of the right to exclude government agencies from their private property.

178.    The collection, long-term retention, searching for and sharing of Plaintiff's and Class members' personal and financial data diminished the value of the data to Plaintiff and the Class and caused damage to Plaintiff and the Class.

179.    Modern courts recognize that confidential personal data is property when, as here, it has independently ascertainable economic value and is treated as a commodity in an established market.[50]

---

[50] *Id.*

180.   As detailed in this Complaint, the personal and financial data has independently ascertainable economic value and was treated as a commodity in an established market.

181.   Defendant intentionally and wrongfully exercised dominion and control over Plaintiff's and Class members' property by capturing the data during payment processing and then sharing it with government entities and others.

182.   BoA's exercise of dominion was inconsistent with, and in outright denial of, Plaintiff's and the Class' rights of ownership and exclusive possession, causing damage and injury-in-fact.

183.   As such, Plaintiff and the Class have suffered a cognizable injury-in-fact that provides them with standing to pursue RFPA and other claims as a result of the harm caused by BoA.

### E.    BoA's Unlawful Disclosure of Plaintiff's Financial Records

184.   At all relevant times, Plaintiff maintained accounts with BoA and was a customer entitled to the protections of the RFPA.

185.   On or around January 7, 2021, and on various other occasions, BoA disclosed Plaintiff's and the Class members' confidential financial records within the meaning of the RFPA and personally identifiable information to government authorities and/or third parties without Plaintiff's authorization and without complying with the procedural requirements of the RFPA.

186.    According to Hill's testimony to the Judiciary Committee, BoA provided the FBI with a list of all individuals who transacted business in the D.C. Metro area with a BoA product or at a BoA location between January 5-7, 2021. Plaintiff transacted business in the D.C. Metro area during that period using his BoA account and/or bank account card, which is maintained in his own name.

187.    The disclosures lacked proper legal process. The RFPA requires that government agencies obtain customer financial records through one of several specified mechanisms: administrative subpoena or summons meeting statutory requirements, search warrant, judicial subpoena, or formal written request with customer authorization. 12 U.S.C. § 3402.

188.    None of these mechanisms were employed here. Instead, BoA provided bulk personal and financial data to local, state and federal agencies without any individualized legal process for each customer whose records are searched and accessed.

189.    The disclosures lacked required customer notice. Under 12 U.S.C. § 3404, when a government authority seeks financial records, the customer must receive notice and has the right to challenge the request in court before the records are disclosed. The government must serve or mail a copy of its request to the customer on or before the date it serves the order or delivers the request to the financial institution. The customer then has 10 to 14 days to challenge the disclosure.

190.   None of these notice requirements were satisfied.

191.   Plaintiff and Class members received no notice that their information was shared, sought or searched.

192.   Plaintiff and Class members had no opportunity to challenge the search or disclosure or to assert their rights before BoA turned over their information to state, government and local authorities and a number of other third parties.

193.   BoA's disclosures also lack required certification.

194.   The RFPA provides that "no financial institution may release the financial records of a customer until the Government authority seeking such records certifies in writing to the financial institution that it has complied with the applicable provisions of this chapter." 12 U.S.C. § 3404(b).

195.   BoA searched and released Plaintiff and the Class's personal financial records without any written certification of RFPA compliance.

196.   The bulk nature of the lists also violates the RFPA's individualized process requirements because the RFPA contemplates that government agencies will seek specific records of specific customers through appropriate legal process.

197.   The statute does not authorize—and Congress specifically rejected—bulk access that would permit government agencies and others to search databases of customer financial records at will and without individualized suspicion or legal process for each search.

198.  No exception to the RFPA's requirements applies.

199.  The RFPA does contain limited exceptions permitting disclosure without notice in certain narrow circumstances, such as examination by banking regulators, grand jury subpoenas, and certain intelligence activities. 12 U.S.C. § 3413. However, none of these exceptions apply to the bulk data-sharing at issue here.

200.  The disclosures were not made pursuant to regulatory examinations of BoA.

201.  The disclosures were not made in response to grand jury subpoenas.

202.  The disclosures were not limited to authorized foreign intelligence activities.

203.  Rather, the disclosures were made of BoA's own accord, initially, and later in cooperation with federal, state and local law enforcement and governmental agencies and provided bulk access to customer financial records for general law enforcement and intelligence purposes—exactly the type of surveillance that Congress intended to prohibit through the RFPA.

204.  BoA made these disclosures without providing Plaintiff with the notice and opportunity to challenge access to her financial records as required by the RFPA.

205.  BoA did not obtain a valid customer authorization, administrative subpoena, search warrant, judicial subpoena, or formal written request before disclosing Plaintiff's financial records.

**F.    Defendant's Disclosures Were Not Made for Any Lawful Purpose**

206.   BoA's disclosures of Plaintiff's financial records were not made pursuant to any lawful purpose contemplated by the RFPA, BSA, USA PATRIOT Act, or any other applicable statute or regulation.

207.   To the extent BoA disclosed Plaintiff's information under the guise of BSA reporting, such disclosures went far beyond the scope of information that financial institutions are required or permitted to report under the BSA. The BSA authorizes the filing of SARs and CTRs containing specific, limited information about transactions that meet certain statutory thresholds or that give rise to genuine suspicion of unlawful activity. The BSA does not require or authorize wholesale disclosure of customers' complete financial histories, personal identifying information, or other confidential data.

208.   BoA's disclosures exceeded the scope of any permissible BSA reporting in the following ways: (a) BoA disclosed information about transactions and accounts that did not meet any statutory reporting threshold; (b) BoA disclosed comprehensive customer profiles and financial histories rather than information about specific suspicious transactions; (c) BoA disclosed information to entities and

agencies not authorized to receive BSA reports; and (d) BoA disclosed information in formats and through channels not contemplated by BSA reporting requirements.

209.    There was no genuine, good-faith basis for BoA to suspect that Plaintiff's transactions involved money laundering, terrorist financing, or any other unlawful activity that would trigger BSA reporting obligations. Plaintiff's banking activity was entirely lawful and unremarkable.

210.    There was no reasonable basis for believing a crime had been committed or that evidence existed in a particular location as a to a particular person.

211.    BoA's employees who filed or approved reports did so negligently, recklessly, or with deliberate indifference to the truth or falsity of the information reported and whether the transaction was truly suspicious or indicative of a criminal nexus.

### G.    BoA's Conduct Exceeded the Scope of the BSA and PATRIOT Act

212.    While the PATRIOT Act enhanced certain reporting requirements and information-sharing authorities, it did not eliminate the requirement that disclosures be made for legitimate anti-money laundering or counter-terrorism purposes, nor did it authorize disclosure of customer information beyond the scope of specific statutory reporting mechanisms.

213.    The BSA and PATRIOT Act authorize only certain mandatory reporting of suspicious activity but do not authorize banks to: (a) Conduct open-ended

59

searches of customer records at the request of law enforcement; (b) provide individualized account information upon informal request; (c) act as a surrogate investigator for the government; or (d) disseminate financial information absent legal process.

214.    The Bank's actions exceeded statutory authority and constituted government-directed surveillance disguised as routine compliance activity.

### H.    BoA's Reports Were Not Made in Good Faith

215.    To the extent BoA filed SARs or other reports purportedly related to Plaintiff's accounts, such reports were not filed in good faith as required by the BSA safe harbor provision, 31 U.S.C. § 5318(g)(3).

216.    BoA's reports lacked good faith because, among other reasons:

a)    BoA filed reports without any genuine basis for suspecting that Plaintiff's transactions involved unlawful activity. Plaintiff's banking activity was ordinary, lawful, and consistent with his known financial profile;

b)    The Fourth Amendment demands particularity to ensure that searches are not so general in nature and to prevent parties acting under the color of law from rummaging through an individual's property without cause, judicial oversight or specific jurisdiction. The searches conducted by BoA were generalized, warrantless searches outside of the requirements of the BSA and lacked the requisite particularity.

c)    BoA filed reports with animus and in retaliation against Plaintiff for exercising legal rights, including but not limited to a presumed protected association with a disfavored political party.

d)    BoA filed reports to curry favor with government agencies or to create the appearance of robust compliance activity, rather than based on

genuine suspicion of unlawful activity and deliberately disregarded Plaintiff's and the Class' rights under the RFPA.

e)  BoA filed reports knowing that the information contained therein could be misleading or was materially incomplete.

f)  BoA filed reports based on factors having no legitimate relationship to anti-money laundering or counter-terrorism objectives, including but not limited to Plaintiff's location, religion, political beliefs or associations.

g)  BoA's internal policies and procedures for identifying suspicious activity were so overbroad, indiscriminate, and lacking in particularity or rational foundation that reports generated pursuant to those policies cannot be said to reflect genuine suspicion of unlawful activity.

h)  BoA failed to conduct adequate investigation before filing reports, instead filing reports based on automated algorithms or pattern-matching systems that generated false positives at rates demonstrating a lack of genuine suspicion.

i)  Because Defendant's reports were not filed in good faith and were filed as a pretext to evade the SAR, BoA is not entitled to the protection of the BSA safe harbor and remains fully liable for violations of the RFPA, 12 U.S.C. § 3401 (1).

## I.    BoA Acted Under the Color of Law and Violated the First, Fourth, and Fifth Amendments

217.    Federal and state law-enforcement agents and governmental agencies communicated with BoA regarding the financial activity of Plaintiff and the Class.

218.    Although no unlawful transactions were committed by Plaintiff or the Class, agents informally coordinated with and requested that BoA "flag," "monitor," or "report" all of customer account activity and provide transaction records and

internal analyses beyond those required under the BSA's Suspicious Activity Report ("SAR") or Currency Transaction Report ("CTR") framework.

219.    In cooperation with law enforcement, BoA acted with deliberate disregard to Plaintiff's and the Class members' rights, initiated non-routine internal investigations and unreasonable searches into Plaintiff's and the Class members' transaction and location history. BoA then voluntarily agreed to provide Plaintiff's and certain Class members' financial information outside the categories or conditions required by statute or regulation.

220.    These searches conducted by BoA were performed without notice, consent, warrant, subpoena, summons, National Security Letter, or any form of legal process, and were not tied to any legitimate anti-money-laundering ("AML") threshold or statutory reporting requirement.

221.    Upon information and belief, BoA accessed, compiled, and transmitted: (a) historical transaction logs and purchase information; (b) location details of customers, (c) customer-profile risk assessments, (d) notes from internal AML analysts, and (e) non-BSA-mandated surveillance and monitoring records.

222.    BoA infringed on Plaintiff's and the Class members' Fourth Amendment right to be free from unreasonable search and seizures. BoA's unlawful cooperation and joint activity with a joint collaboration made up of federal, state and local law-enforcement and governmental agencies and the Financial Crimes

Enforcement Network ("FinCEN"), through which BoA provided Plaintiff's confidential financial information to government officials without a warrant, subpoena, or other lawful process.

223.    Additionally, by voluntarily and proactively sharing customer records, internal transaction data, and surveillance notes outside the scope contemplated by the Bank Secrecy Act ("BSA"), USA PATRIOT Act, and implementing regulations, and by conditioning Plaintiff's continued access to banking services on ongoing disclosure to federal, state and local law enforcement and governmental agencies, BoA acted under color of federal and state law, jointly participating with government actors to effect a warrantless search and seizure in violation of the Fourth Amendment.

224.    BoA's conduct exceeded any permissible statutory reporting requirements and was undertaken at the request, encouragement, and direction of government officials, rendering the Bank a willful participant in joint activity with the State under § 1983.

225.    BoA provided records directly to federal, state and local law-enforcement and government agents, outside the established SAR regime, and in communication formats designed for investigative use.

226.    Later, BoA also cooperated with government agents' instruction about what information to search for and how to structure the reports, and BoA complied.

227.    Defendant and law enforcement maintained ongoing, iterative communication concerning Plaintiff's financial activity and continued monitoring.

228.    Defendant's conduct was therefore undertaken with the knowledge, encouragement, and participation of law-enforcement actors.

**J.    BoA Converted Property Plaintiff's and Class Members' Personal and Financial Data**

229.    By capturing and sharing Plaintiff's and the Class members' property without authorization, BoA committed the common-law tort of conversion.

230.    BoA captured and retained a vast amount of personal and financial data from Plaintiff and the Class—far beyond what was necessary to process a financial transaction—and then used that information for its own profit, commercial exploitation and to curry favor with federal, state and local government agencies.

231.    At all times relevant to and in the manner described in this Complaint, BoA's retention and sharing of personal and financial information was done without the knowledge or consent of Plaintiff and Class members.

232.    In retaining the data, using it for their own profit and to curry favor, BoA went well beyond the scope of its role as a bank and Plaintiff and Class members were required to surrender more information and property in the transaction than they would have otherwise.

233.    Plaintiff and the Class were unaware of the vast and ever-growing technological capabilities until the government's release of the March 6, 2024 and

December 6, 2024 Staff Reports, and never consented to this extensive collection, retention and sharing of their data.

234.    BoA nevertheless treated the captured data as its own commodity, using it "every day" as its own commodity and curry favor with federal, state and local government agencies.

235.    Plaintiff's and Class members' personal and financial consumer information has value.

236.    Basic financial data of this type, alone, has objectively ascertainable fair-market value.

237.    Plaintiff and Class members own and possess a cognizable property interest in their personally identifiable and financial information, including their name, address, and complete financial and biometric data.

238.    "One of the main rights attaching to property is the right to exclude others." *People v. Stewart*, 113 Cal. App. 4th 242, 250 (2003) (quoting 2 William Blackstone, *Commentaries* 2 (1766)("There is nothing which so generally strikes the imagination, and engages the affections of mankind, as the right of property; or that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe.")(cited with approval in *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1024 (N.D. Ca. 2024)).

239.    In retaining, using and sharing their personal and financial data, Plaintiff and the Class were deprived of the right to exclude government agencies and other third parties from their private property.

240.    The use of Plaintiff's and the Class's personal and financial data has diminished the value of the data to Plaintiff and Class members and caused damage to Plaintiff and Class members.

241.    Courts recognize that confidential personal data is property for purposes of the tort of conversion when, as here, it has independently ascertainable economic value and is treated as a commodity in an established market.

242.    BoA intentionally and wrongfully exercised dominion and control over Plaintiff's and Class members' property by capturing the extensive data as described in this Complaint, which goes far beyond what is essential to perform its banking duties, and then sharing that data with third parties, including government agencies.

243.    BoA's exercise of dominion was inconsistent with, and in outright denial of, Plaintiff's and Class members' rights of ownership and exclusive possession, causing damage and injury-in-fact.

244.    Plaintiff and Class members did not consent to BoA's retention or sharing of their property.

245.    As a direct and proximate result, Plaintiff and each Class member have been damaged in an amount equal to the fair-market value of the converted property.

246.    BoA's conversion was willful, wanton, and in reckless disregard of Plaintiff's and Class members' rights, warranting punitive damages.

247.    BoA also received a measurable economic benefit (proceeds from the use of the data for its own purpose and to curry favor with government agencies) at the direct expense of Plaintiff and the Class.

248.    It would be inequitable and unconscionable for BoA to retain that benefit.

249.    Plaintiff and the Class are entitled to restitution/disgorgement in an amount commensurate with the market value of the data at the time it was collected, retained and used by BoA.

### K.    Damages Suffered by Plaintiff and Class Members

250.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and the Class have suffered substantial damages, including but not limited to:

      a) Invasion of privacy and loss of the confidentiality of their financial records and personal information;

b) Invasion of privacy and loss of value in their property rights and personal and financial information;

c) Wrongful termination of banking relationships, including sudden account closures and denial of banking services;

d) Placement on government watch lists and law enforcement databases and increased risk scoring, resulting in enhanced scrutiny, travel restrictions, and other adverse consequences;

e) Adverse employment consequences, including termination, denial of security clearances, and lost business opportunities;

f) The costs of obtaining legal counsel and other professional assistance to address the consequences of Defendant's unlawful disclosures; and

g) Other consequential damages flowing from Defendant's violations of law.

## IV.    CLASS ALLEGATIONS

251.   Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Florida Rule of Civil Procedure 1.220 of the Florida Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements.

252.   The proposed Classes are defined as:

**Nationwide Search Class**. Any person or authorized representative of a person who utilized a BoA service in relation to an account maintained in that

68

person's name whose financial records were subject to searches without a lawful purpose between January 5, 2021 and January 5, 2024, including but not limited to all persons in the United States who, during the applicable statute of limitations period, had their financial records searched by BoA.

**Nationwide Disclosure Class**. Any person or authorized representative of a person who utilized a BoA service in relation to an account maintained in that person's name whose financial records were provided or disclosed to government authorities or third parties between January 5, 2021 and January 5, 2024 based on search results using a customer's location, MCC codes of a customers' purchases, indicia of a customer's political party affiliation, and/or the names of stores at which customers made purchases, where the disclosure was not subject to a subpoena, notice or consent by the customer.[51]

**State Classes.** All BoA customers who maintained a consumer credit card or consumer deposit account whose financial records were converted and provided to a government authority from January 5, 2021 to January 5, 2024), during the applicable period of time.

253.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

254.    Excluded from the Classes are BoA, its parents, subsidiaries, affiliates, officers and directors, any entity in which BoA has a controlling interest, all customers or persons who make a timely election to be excluded, governmental

---

[51] The terms "financial record," "person," "government authority" and "customer" are defined in accordance with the RFPA: (1) financial record "means an original of, a copy of, or information known to have been derived from, any record held by a financial institution pertaining to a customer's relationship with the financial institution;" (2) government authority "means any agency or department of the United States, or any officer, employee, or agent thereof;" (3) person "means an individual or partnership of five or fewer individuals;" and (4) customer means "any person or authorized representative of that person who utilized or is utilizing any service of a financial institution, or for whom a financial institution is acting or has acted as a fiduciary, in relation to an account maintained in the person's name." 12 U.S.C. § 3401(2)-(5).

authorities, and all jurors and court personnel assigned to any aspect of this litigation, as well as their immediate family members.

255.   Adequacy: Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, anti-money laundering rules and regulations, Bank Secrecy Act regulation and compliance, PATRIOT Act regulation and compliance, data privacy, and, in particular, class actions on behalf of consumers involving financial institutions. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to or in conflict with the Class. Plaintiff has retained counsel experienced in complex class action litigation who will vigorously prosecute this action on behalf of the Class. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

256.   Numerosity: The Class is so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of thousands of individuals whose financial records were unlawfully searched and disclosed by BoA. The precise number and identities of Class members can be ascertained through Defendant's records.

257.   Typicality: The claims of representative Plaintiff are typical of the claims of the Classes in that they arise out of the same wrongful conduct by BoA. Plaintiff seeks to represent class members, who similar to Plaintiff, had financial

records searched provided to government authorities without warrant, notice, consent or any recognized exception. The representative Plaintiff, like all Class members, has been damaged by BoA's misconduct. The factual basis of BoA's misconduct is common to the Class and represents a common thread of unfair and unconscionable conduct result in injury to all members of the Classes. Plaintiff suffered the harm alleged and has no interests antagonistic to the interests of any other class member.

258.   Commonality: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members. These common questions include, but are not limited to:

a) Whether Defendant disclosed Class members' financial records to government authorities or third parties;

b) Whether BoA's disclosures complied with the procedural requirements of the RFPA;

c) Whether BoA's reports were filed in good faith as required by 31 U.S.C. § 5318(g)(3);

d) Whether BoA violated the RFPA;

e) Whether BoA acted as a private party under color of the law when it was cooperating with law enforcement agencies;

71

f) Whether Plaintiff and the Class have a reasonable expectation of privacy in their financial records that was violated by BoA while acting under the color of law;

g) Whether Plaintiff and the Class were deprived of their right to substantive or procedural due process while BoA was acting under the color of law;

h) Whether Plaintiff and the Class were deprived of their right to free association and/or whether BoA's conduct while acting under the color of law had a chilling effect;

i) Whether BoA converted Plaintiff and the Class members' property;

j) Whether Plaintiff and the Class members are entitled to actual damages, statutory damages, nominal damages and/or punitive damages; and

k) Whether Class members are entitled to injunctive and declaratory relief.

259. Predominance: Questions of law and fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense.

260.    Superiority: A class action is superior to other method for the fair and efficient adjudication of this controversy. Since the amount of each individual class member's claim is small relative to the complexity of the litigation, and due to the financial resources of BoA, no class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the class members will continue to suffer harm and BoA's misconduct will proceed without remedy.

261.    Even if class members could afford to litigate individually, the court system could not. Given the legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far few management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

262.    Injunctive and Declaratory Relief: Defendant has acted or refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### *Violation of the Right to Financial Privacy Act, 12 U.S.C. § 3401 et seq.*
### *(On Behalf of Plaintiff Nationwide Disclosure Class)*

263.    Plaintiff incorporates by reference paragraphs 1 through 262 as if set forth here in full.

264.    As a bank, BoA is a "financial institution" as defined by the RFPA, 12 U.S.C. § 3401(1).

265.    Plaintiff and Class members are "customers" as defined by the RFPA, 12 U.S.C. § 3401(5).

266.    The information disclosed by Defendant constitutes "financial records" as defined by the RFPA, 12 U.S.C. § 3401(2).

267.    The RFPA prohibits financial institutions from providing a customer's financial records to a government authority except pursuant to specific statutory procedures.[52]

268.    Defendant violated the RFPA by disclosing Plaintiff's and Class members' financial records to government authorities without complying with the procedural requirements of the RFPA, including the requirements for customer authorization, administrative subpoenas, search warrants, judicial subpoenas, or formal written requests set forth in 12 U.S.C. §§ 3404-3408.

---

[52] *See* 12 U.S.C. § 3402.

269.   BoA violated the RFPA by failing to provide Plaintiff and Class members with the requisite notice and opportunity to challenge government access to their financial records as required by 12 U.S.C. §§ 3405-3408.

270.   BoA's disclosures were not made for any lawful purpose contemplated by the RFPA or any exception thereto.

271.   BoA's conduct was willful, knowing, and/or reckless.

272.   BoA is not entitled to the BSA safe harbor protection because its reports were not filed in good faith as required by 31 U.S.C. § 5318(g)(3).

273.   As a direct and proximate result of BoA's violations of the RFPA, Plaintiff and Class members have suffered damages including actual damages, are entitled to statutory damages, and are entitled to punitive damages pursuant to 12 U.S.C. § 3417.

274.   Plaintiff and Class members are also entitled to recover their costs and reasonable attorney's fees pursuant to 12 U.S.C. § 3417(a)(4).

## SECOND CAUSE OF ACTION
### *Violation of the RFPA:*
### *Disclosures Without Lawful Purpose*
### *(On Behalf of Plaintiff and Nationwide Disclosure Class)*

275.   Plaintiff incorporates paragraphs 1 through 262 as if set forth here in full.

276. Even if BoA had complied with certain procedural requirements of the RFPA (which Plaintiff and Class members deny), BoA's disclosures were nevertheless unlawful because they were not made for any lawful purpose.

277. The RFPA exceptions permitting disclosure of financial records require that such disclosure be for a legitimate law enforcement or regulatory purpose. Defendant's disclosures were not made for any such purpose.

278. BoA's disclosures were made without any genuine basis for suspecting that Plaintiff's or Class members' transactions involved unlawful activity.

279. BoA's disclosures exceeded the scope of any permissible purpose under the BSA, PATRIOT Act, or any other applicable statute.

280. Because BoA's disclosures were not made for any lawful purpose, they constitute violations of the RFPA for which BoA is liable for actual damages, punitive damages, costs, and attorney's fees.

### THIRD CAUSE OF ACTION
*Violation of the RFPA:*
*Bad Faith Reporting*
*(On Behalf of Plaintiff and Nationwide Disclosure Class)*

281. Plaintiff incorporates paragraphs 1 through 262 as if set forth here in full.

282. To the extent BoA claims its disclosures were made pursuant to BSA reporting requirements, BoA is not entitled to the safe harbor protection of 31 U.S.C. § 5318(g)(3) because BoA's reports were not filed in good faith.

283.   The good faith requirement is a mandatory prerequisite to safe harbor protection. A financial institution that files reports knowing they lack factual foundation, for improper purposes, or with reckless disregard for the truth is not entitled to immunity from RFPA liability.

284.   BoA's reports concerning Plaintiff and Class members were not filed in good faith because: (a) they lacked any genuine basis in fact; (b) they were filed as pretext and for improper purposes including retaliation, institutional convenience, and/or to create an appearance of compliance; (c) they contained false, misleading, or materially incomplete information; (d) they were based on factors unrelated to legitimate anti-money laundering objectives or counter-terrorism; and/or (e) they were filed negligently, recklessly, or with deliberate indifference to their truth or accuracy.

285.   Because BoA's reports were not filed in good faith or within the permissible parameters of the BSA, the BSA safe harbor does not apply, and BoA is fully liable under the RFPA for all disclosures made in connection with such reports.

286.   As a direct and proximate result of BoA's bad faith reporting, Plaintiff and Class members have suffered damages and are entitled to actual damages, punitive damages, costs, and attorney's fees under 12 U.S.C. § 3417.

## FOURTH CAUSE OF ACTION
### *Violation of the RFPA:*
### *Disclosures Exceeding Scope of BSA/PATRIOT Act*
### *(On Behalf of Plaintiff and Nationwide Disclosure Class)*

287. Plaintiff incorporates paragraphs 1 through 263 as if set forth here in full.

288. The BSA and PATRIOT Act authorize financial institutions to file specific categories of reports with designated government agencies. These statutes do not authorize unlimited disclosure of customer financial information.

289. BoA's disclosures went far beyond what is permitted or contemplated by the BSA or PATRIOT Act in the following respects:

(a) BoA disclosed information about transactions and accounts that did not meet any statutory reporting threshold and that did not give rise to any genuine suspicion of unlawful activity;

(b) BoA failed to limit its disclosures to information about specific reportable transactions;

(c) BoA disclosed information to government agencies and other entities that are not authorized recipients of BSA reports;

(d) BoA disclosed information through channels and in formats not contemplated by BSA reporting mechanisms;

(e) BoA voluntarily disclosed customer information beyond what any statute requires or permits; and,

(f) BoA used BSA reporting as a pretext to disclose customer information for purposes unrelated to anti-money laundering or counter-terrorism objectives.

290. Because BoA's disclosures exceeded the scope of any permissible BSA or PATRIOT Act reporting, such disclosures are not protected by any safe harbor provision and constitute independent violations of the RFPA.

291.   As a direct and proximate result of BoA's conduct, Plaintiff and Class members have suffered damages and are entitled to statutory damages, any actual damages, punitive damages, costs, and attorney's fees under 12 U.S.C. § 3417.

### FIFTH CAUSE OF ACTION
*Violation of the Fourth Amendment (42 U.S.C. § 1983):*
*Unreasonable Search and Seizure by Private Actor Acting Under Color of Law*
*(On Behalf of Plaintiff and Nationwide Search Class)*

292.   Plaintiff incorporates paragraphs 1 through 262 as if set forth here in full.

293.   BoA's actions constituted a search and seizure of Plaintiff's and Class members' financial information for law-enforcement purposes.

294.   These searches and disclosures occurred without a warrant, without probable cause, without legal justification or process, and without Plaintiff's and Class members' consent.

295.   BoA acted under color of law because its conduct: a. Was done in joint activity with law-enforcement officials; b. Was undertaken at the significant encouragement and/or direction of law-enforcement agencies; c. Was part of a collaborative investigative enterprise in which BoA and government actors worked together to surveil Plaintiff and Class members; and d. Functionally transformed BoA into an investigative arm of the government.

296.   BoA's conduct constitutes state action attributable to the government, making it liable under § 1983.

297.   Plaintiff and the Class had a personal, legitimate expectation of privacy in the place or thing searched.

298.   That expectation was one society recognizes as reasonable.

299.   BoA's conduct invaded an area where Plaintiff and Class members had a reasonable expectation of privacy.

300.   BoA conducted searches of Plaintiff and Class members' records and those searches were constitutionally deficient for lack of warrant, cause, and particularity.

301.   There was no probable cause because BoA lacked facts or circumstances sufficient to warrant a person of reasonable caution to believe a crime would be found.

302.   There is no recognized exception to the warrant requirement that justified the search.

303.   If a recognized exception existed in a broad view of the law, it lacked particularity because the language of the exception failed to describe with specificity the place to be searched or items to be seized, resulting in an impermissible and unconstitutional application of the exception.

304.   BoA's conduct also intruded on a constitutionally protected area to obtain information.

305.   By virtue of the RFPA, the unlawfulness of BoA's conduct was clearly established at the time of the searches.

306.   As a direct and proximate result of BoA's conduct, Plaintiff and Class members suffered damages including deprivation of life, liberty and the pursuit of happiness, emotional distress, reputational harm, and invasion of privacy.

### SIXTH CAUSE OF ACTION
*Violation of Fifth Amendment (42 U.S.C. § 1983):*
*Deprivation of Procedural and Substantive Due Process*
*by Private Actor Acting Under Color of Law*
*(On Behalf of Plaintiff and Nationwide Search Class)*

307.   Plaintiff incorporates paragraphs 1 through 262 as if set forth here in full.

308.   Plaintiff and the Class have a legitimate claim of entitlement and interest in a right to privacy of their financial records arising from the RFPA.

309.   BoA deprived Plaintiff and the Class of that interest without adequate process in that BoA failed to provide constitutionally adequate notice or procedures both before and after the deprivation of their rights.

310.   BoA's actions were arbitrary, capricious, and without rational basis, and its actions were not narrowly tailored to serve a compelling government interest.

311.   BoA's actions infringed on a fundamental right.

312.   BoA's conduct shocked the conscience in that BoA was deliberately indifferent to Plaintiff's and Class members' statutory and constitutional rights.

313.   As a direct and proximate result of BoA's conduct, Plaintiff and Class members suffered damages including deprivation of life, liberty and the pursuit of happiness, emotional distress, reputational harm, and invasion of privacy.

## SEVENTH CAUSE OF ACTION
### *Violation of First Amendment (42 U.S.C. § 1983):*
### *Free Association*
### *(On Behalf of Plaintiff and Nationwide Search Class)*

314.   Plaintiff incorporates paragraphs 1 through 262 as if set forth here in full.

315.   At all times relevant to the Complaint, BoA was acting as a private party under the color of state law.

316.   Plaintiff and Class members have a right to protected associational activity.

317.   Plaintiff and Class members were engaged in protected associational activity or presumed to be engaged in protected associational activity.

318.   Such associational activity was for expressive purposes protected by the First Amendment.

319.   BoA took adverse action against Plaintiff and Class members as a result of the protected associational activity or presumed associational activity.

320.   The protected conduct was a substantial or motivating factor in the adverse action, and a causal connection exists between the protected association and the adverse action.

321. BoA's actions were not narrowly tailored to serve a compelling interest or lacked sufficient justification under the applicable standard.

322. As a direct and proximate result of BoA's conduct, Plaintiff and Class members suffered damages including deprivation of life, liberty and the pursuit of happiness, emotional distress, reputational harm, and invasion of privacy.

## EIGHTH CAUSE OF ACTION
### Conversion
### (*As to Plaintiff and State Classes*)

323. Plaintiff incorporates paragraphs 1 through 262 as if set forth here in full.

324. Plaintiff and class members own and possess a cognizable property interest in their personal and financial information, including their name, address, physical location and credit card or other financial data. Modern courts recognize that confidential personal data is property for purposes of the tort of conversion when, as here, it has independently ascertainable economic value and is treated as a commodity in an established market.

325. BoA intentionally and wrongfully exercised dominion and control over Plaintiff's and Class members' property by capturing their data and then sharing it with governmental agencies.

326.   BoA's exercise of dominion was inconsistent with, and in outright denial of, Plaintiff's and class members' rights of ownership and exclusive possession.

327.   Plaintiff and class members did not consent to BoA's capture, retention, or sharing of their property.

328.   As a direct and proximate result, Plaintiff and each class member have been damaged in an amount equal to the fair-market value of the converted property.

329.   BoA's conversion was willful, wanton, and in reckless disregard of Plaintiff's and Class members' rights, warranting punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests that the Court enter judgment against Defendant as follows:

(A)   Certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

(B)   Declaring that Defendant's conduct as alleged herein violates the Right to Financial Privacy Act, 12 U.S.C. § 3401 *et seq*.;

(C)   Declaring that Defendant was acting under the color of law and violated Plaintiff's and Class members' Fourth and Fifth Amendment rights under the United

States Constitution because it deprived Plaintiff and Class members' of procedural and substantive due process and subjected them to unreasonable, unconstitutional searches and seizures;

(D)    Awarding Plaintiff and the Class actual damages in an amount to be proven at trial and/or nominal damages;

(E)    Awarding Plaintiff and the Class statutory damages as permitted by 12 U.S.C. § 3417;

(F)    Awarding Plaintiff and the Class punitive damages in an amount sufficient to punish Defendant and deter future misconduct;

(G)    Awarding Plaintiff and the Class their costs and reasonable attorney's fees pursuant to 12 U.S.C. § 3417(a)(4) and 42 U.S.C. § 1988;

(H)    Awarding Plaintiff and the Classes damages in an amount sufficient to compensate Plaintiff and Class members for Defendant's violations of state law, including costs and reasonable attorney's fees;

(I)    Awarding pre-judgment and post-judgment interest at the maximum rate permitted by law;

(J)    Enjoining Defendant from continuing to engage in the unlawful practices alleged herein;

(K)    Ordering Defendant to implement policies and procedures to ensure future compliance with the RFPA, the Fourth Amendment, and the Fifth Amendment; and

(L)    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 5, 2026

LEVIN LAW, P.A.

*/s/ Brian Levin*
Brian Levin, Fla. Bar No. 26391
brian@levinlawpa.com
Kelly Needleman Brennan*,
Al. Bar No. 4440-A50B
kelly@levinlawpa.com
Brandon T. Grzandziel,
Fla. Bar No. 58732
brandon@levinlawpa.com
2665 South Bayshore Drive, PH2
Miami, FL 33133
Telephone: (305) 402-9050
Facsimile: (305) 676-4443

*Counsel for Plaintiff and the Proposed Class*

*\* Pro Hac Vice Admission Applications Forthcoming*